Atkinson, J.,
delivered the opinion of the court:
Plaintiff brings this suit to recover the sum of $18,000, based upon the canceling of an agreement made and entered *171 into May 2, 1910, between himself and the United States, for the furnishing of teams to haul willow brush to be used by the defendants in the improvement of the Mississippi Fiver, covering the period from June 5, 1910, to March 1, 1911. Under an advertisement issued by the Engineer’s Department for bids for said purpose, plaintiff was awarded the contract at the rate of $3.38 for each two-horse or two-mule team per day during said period.
Section 1 of the published specifications (which are made a part of plaintiff’s petition) estimated that not fewer than 20 or more than 50 teams would be required, and that the length of the haul and the condition of the roads would have to be considered to determine the necessary number. Twenty teams were accepted out of 32 furnished at the beginning of the service as conforming to the requirements of the specifications as to strength and efficiency and were put to work under the contract. From time to time thereafter the number of teams was increased to 84, which were accepted and approved by the agents of the Government, and were continuously employed until October 14, 1910, when plaintiff was ordered by the engineer in charge to discontinue further operations under his contract, assigning as a reason therefor failure to comply with the specifications therein.
Section 7 of the specifications under which plaintiff’s 6id was accepted is in the words following:
“In case the contractor fails to supply the number of wagons, teams, and necessary equipment required for the successful and economical prosecution of the work, then the United States will have “the right to hire such additional wagons, teams, drivers, and equipment as may be necessary, and to deduct whatever additional cost over the contract price there may be from any amount due the contractor.”
Nowhere in the specifications is it provided that the defendants shall have the authority to cancel or annul the agreement or contract. Only when the contractor fails to furnish the necessary number of teams provided by the agreement could they act, and then only after giving the contractor reasonable notice (no specified time being mentioned in the specifications) could they proceed under sec *172 tion 7, supra, to hire such additional wagons, teams, etc., necessary to complete the work, and charge the additional cost, if any, to the contractor. The fact that the teams were inspected, approved, and used by the agents of the defendants is a still stronger reason why reasonable notice in writing should have been given to plaintiff as to the alleged insufficiency of his service, thus to enable him to supply additional teams, if it was necessary so to do, before they were employed by the defendants at plaintiff’s expense to carry out the provisions of the agreement. There being no forfeiture clause in the agreement, it could not be revoked by a mere notice of cancellation on the part of either party thereto.
The remaining question in the case is the amount of damages plaintiff should be awarded for the breach of the agreement by the defendants. The measure of damages is the difference between the actual cost of the teams to plaintiff and the price fixed in the agreement that he was to be paid per day for each team furnished by him which had been approved and accepted bjr the agents of the defendants, “ making a reasonable deduction for the loss of time, trouble, risk, and responsibility attending the full execution of the contract.” (Speed v. United States, 18 Wall., 77.)
The exact cost of executing the work is not clearly shown by the evidence. It is shown by the findings, however, that it would have reasonably cost plaintiff $2.25 per day for the maintenance of each of the 14 teams that he personally owned, which would leave him a profit of $1.18 on each team per day. After the annulment of the contract by the Government (October 14)-there remained 125 days of the contract in which teams were worked, and the defendants paid for 3,429-f days (on the basis of one team per day), and during that period there were employed, as shown by the records of the War Department, 3,814 teams. Admitting that plaintiff would have worked his 14 teams all of the 125 days, he would have worked 1,750 days. If, therefore, his profit was $1.13 per day on each of his teams, the aggregate profit thereon would be $1,977.50. Plaintiff had, of his own •accord, raised the price for the 50 hired teams from $2.50 a day to $2.75, which would have left him a profit of 63 *173 cents on each team per day during the remaining period of his contract; and, calculating on the basis of one team for l,679f days at 63 cents per day, his profits would have been $1,058.08. This amount plus $1,977.50 — the profit allowed on his own 14 teams — would show a net profit to the contractor of $3,035.58. We have taken the official report of the War Department for the number of teams paid for the period from the annulment of the contract to March 1,1911, when it would have expired by limitation, and after making a reasonable allowance for the 'upkeep of plaintiff’s 14 teams our conclusion is that plaintiff should be given a judgment for the sum of $3,035.58, as shown by Finding XIV.
We have not considered plaintiff’s claim embodied in' Findings XVI, XVII,' and XVIII, based upon alleged profits which would have accrued to him if he had been permitted to complete his contract, or for alleged loss to him because of the abrogation of the contract by the agents of the defendants, for the reason that the operation of a commissary business was not a part of the contract and had no connection with executing the work required under the same.
Judgment is accordingly awarded to plaintiff for the sum of $3,035.58.